604 P.2d 51

R. Keith HIGGINSON, Director, Idaho
Department of Water Resources,
Plaintiff-Appellant,

v.

Golden C. WESTERGARD,
Defendant-Respondent.

No. 12771.

Supreme Court of Idaho.

Nov. 27, 1979.

688

David H. Leroy, Atty. Gen., Josephine P. Beeman, Deputy Atty. Gen., Boise, for plaintiff-appellant.

Dwight E. Baker of Furchner, Martsch & Baker, Blackfoot, for defendant-respondent.

DONALDSON, Chief Justice.

R. Keith Higginson, Director of the Idaho Department of Water Resources (department), originally brought this action in the district court in March, 1976 to compel defendant Golden C. Westergard to remove a gravel dike allegedly interfering with the flow of the Salmon River adjacent to property owned by Westergard in Custer County. The department appeals a district court judgment in Westergard's favor.

On or about March 27, 1975, Westergard applied to the Department of Water Resources for a permit to conduct a streambed alteration. The purpose of the permit was to place gravel fill and rip rap rock on about 325 yards of eroded bank along riparian lands owned by Westergard on the east side of the Salmon River.

On his application, Westergard indicated that he would use a gravel bar, located in the west side of the river, as a source of fill material to be placed against the eroded east bank and then place the rip rap rock over the gravel. The application also stated that a caterpillar type tractor would be used to move the gravel and place it along the bank. Westergard's application also stated that he would be working below the water surface, and intended to control the resulting turbidity and pollution by diverting as much water as possible around the work area. The application stated that diversion was to be accomplished by means of a temporary channel to be constructed through the gravel bar.

On April 25, 1975, Kenneth Dunn, Administrator of the Operations Division of the Department, approved Westergard's application, subject to certain conditions of which (5) and (7) are pertinent:

"(5) Water must be diverted around the work area during construction; the water to be returned to its original channel after construction is completed. . . .
(7) The expiration date of this permit shall be May 30, 1975."

On May 13, 1975, work on the stream alteration project was begun by Elmer Whiting, who was hired by Westergard. Using his tractor, Whiting windrowed gravel from the west gravel bar and from gravel out of the middle of the channel, thus in effect creating a temporary dike. He then began the process of pushing it over to the east bank of the river, the site of the erosion. Three days later, apparently in response to telephone calls from neighbors, the department's regional supervisor, Mike Steel, arrived at the location of the stream alteration to investigate.

Upon arriving at the scene, Steel, upon viewing the high stage of the river and without prior notice to Westergard or his agent Whiting, ordered Westergard to remove the tractor from the river immediately. The parties are in dispute as to the precise nature of Steel's order, with the

department claiming that Westergard was ordered to stop work only on the dike, with work on the bank project still permitted, while Westergard claims he was ordered out of the river at both places for an indefinite period of time.

As a result of being ordered from the river, Westergard never completed work on the bank project and the dike was not removed from the river. When it became apparent that the river would not wash the dike out, the department on January 29, 1976, directed Westergard to remove the dike. When Westergard failed to comply with the order, the department filed suit in the district court, seeking a decree enjoining him to do so.

Upon the department's ex parte application Westergard was ordered to show cause why he should not be required to remove the dike. At the time of the hearing on the order to show cause, it was agreed by both parties to proceed to a trial on the merits that same day.

Thereafter, the district court by letter advised the parties of his opinion that the department had wrongfully interfered with the permitted work being performed by Westergard and was accordingly entitled to no relief. The department's motion for new trial and alternatively, for reconsideration of the district court's decision, was denied. The court's decision in the form of amended findings of fact and conclusions of law was entered, finding that the department had acted without reasonable justification in ordering Westergard to terminate his work and that the department's interruption of the work caused the channel alteration of which the department now complained. The court also found that the department failed to show irreparable harm from the presence of the dike in the stream and entered judgment for Westergard. The department appeals.

The department contends that there are three issues on appeal: (1) whether Wester-

gard was in violation of his stream channel permit; (2) whether the record contains sufficient evidence to support the district court's findings of fact and conclusions of law; and (3) assuming that Westergard was in violation of his stream channel permit, whether a mandatory injunction ordering Westergard to remove the dike from the river is a proper remedy under the Stream Channel Alteration Act, I.C. § 42–3801 et seq., or at common law.

■ In determining whether Westergard was in violation of his permit, we are limited on appeal to a review of those factual findings made by the lower court. I.R.C.P. 52(a); *King v. H. J. McNeel, Inc.,* 94 Idaho 444, 489 P.2d 1324 (1971). Such findings of fact made by the trial court will not be set aside unless clearly erroneous. I.R.C.P. 52(a); *Marshall Bros., Inc. v. Geisler,* 99 Idaho 734, 588 P.2d 933 (1978); *Matter of Estate of Courtright,* 99 Idaho 575, 586 P.2d 265 (1978).

■ When findings of fact are challenged, the appellant has the burden of showing error, and the reviewing court will review the evidence in a light most favorable to the respondent. *Glenn Dick Equipment Co. v. Galey Construction Co., Inc.,* 97 Idaho 216, 541 P.2d 1184 (1975); *accord, Furness v. Park,* 98 Idaho 617, 570 P.2d 854 (1977). In this case the trial court found that Westergard's work conformed to the conditions of the permit. To determine whether such a finding was erroneous, a review of the permit and an examination of the record is in order.

Rule 6.1 of the Rules and Regulations for Stream Channel Alterations, provides that "all work shall be done in accordance with the application submitted and subject to any conditions specified on the permit." Rules and Regulations, Department of Water Resources, State of Idaho, Stream Channel Alterations, Rule 6.1, 1978.[1] As noted in the department's brief, the application form used by the department provides

---

1. As explained in the department's appellate brief, the rules and regulations for stream channel alterations have been in effect since June, 1973. Revised rules and regulations adopted

October 15, 1974 were in effect at the time this lawsuit was initiated. In both the 1974 rules and their 1978 successors, Rule 6.1 appears as above quoted.

for departmental action to be noted on the back page of the application, and the approved application becomes the permit.

The department argues that Westergard's work was not in compliance with either item No. 10 of the submitted application or with condition No. 5 of the permit. Specifically, the department alleges that item No. 10 calls for diversion of water around the work area by means of a temporary channel to be created through the gravel bar. The department claims that no temporary channel was constructed through the bar to divert water and that such failure amounted to non-compliance with the conditions of the permit. Likewise, condition No. 5 calls for the diversion of water around the work area during construction; the water to be returned to its original channel after construction is completed. The department contends that this condition was not met because the work area was not dewatered prior to the commencement of the bank erosion work.

Westergard counters these arguments by relying on the testimony of his contractor Whiting, who testified that he pushed gravel material with his tractor from the bed of the river on the west bank towards the east bank in a series of sweeping motions to form a gravel dike. Westergard argues that this movement, in effect, created a temporary channel in the river where the gravel used in the dike had formerly lain on the river bed. The windrow served as both fill material for the erosion project and temporarily diverted the stream current away from the work project. After the placement of the material onto the bank and its use as fill material, the stream would return to its original channel. Westergard thus claims he was in compliance with both application item No. 10 and permit condition No. 5.

A review of the terms used in both the application and the permit reveals a variance between item No. 10 and condition No. 5. Item No. 10 asks, "Will water be diverted around the *area to be altered?*" while condition No. 5 states, "Water must be diverted around the *work area* during con-

struction. . . ." (emphasis added) The terms "area to be altered" and "work area" are not defined in the terms of the application-permit, nor are they defined in any of the provisions of the Stream Channel Alteration Act or the Rules and Regulations adopted by the department. This variance in terminology becomes important in view of the department's contention that Westergard's failure to divert water around the "work area" placed him in violation of the permit.

The department argues that the term "work area" meant every area where the use of Whiting's tractor caused alteration of the streambed; that, in accordance with condition No. 5, water had to be diverted *around* the "work area"—that area between the gravel bar on the west bank of the river and the area of bank erosion work on the opposite side. Because the "work area" did not have water diverted *around* it, Westergard violates this condition of the permit.

Westergard, however, contends: that the area around which water was to be diverted was as stated in the application item No. 10, "the area to be altered," which he argues is the east bank of the river where he intended to place the gravel fill; diversion of water around this area was being accomplished by the movement of the gravel bar towards the eastern bank; thus, he was in compliance with the terms of his permit. Westergard argues that the department's construction of "work area" would require that all the flowing water within the entire width of the river, from the gravel bar on the west bank over to the east bank, would somehow have to have been diverted, since Whiting's tractor was moving gravel across this area.

We thus turn our attention to a discussion of the construction of these permit terms. A rule or regulation of a public administrative body or officer ordinarily has the force and effect of law and is an integral part of the statute under which it is made just as though it were prescribed in terms therein. *Howard v. Missman*, 81 Idaho 82, 337 P.2d 592 (1959). Since the Department of Water Resources is an adminis-

trative body under I.C. § 42–3803(c) and I.C. § 67–5201 et seq., the same principles of construction that apply to statutes apply to rules and regulations promulgated by an administrative body. 73 C.J.S. Public Administrative Bodies & Procedure, § 105 at 425; *Orloff v. Los Angeles Turf Club,* 36 Cal.2d 734, 227 P.2d 449, 452 (Cal.1951); *Hillman v. Northern Wasco County People's Utility Dist.,* 213 Or. 264, 323 P.2d 664, 680 (1958); *Hayes v. Yount,* 87 Wash.2d 280, 552 P.2d 1038, 1044 (1976).

▮ In construing statutes, the plain, obvious and rational meaning is always to be preferred to any curious, narrow, hidden sense. *Nagel v. Hammond,* 90 Idaho 96, 408 P.2d 468 (1965); *John Hancock Mutual Life Ins. Co. v. Haworth,* 68 Idaho 185, 191 P.2d 359 (1948). When choosing between alternative constructions of a statute, courts should presume that the statute was not enacted to work a hardship or to effect an oppressive result. *Lawless v. Davis,* 98 Idaho 175, 560 P.2d 497 (1977). Consequences of a proposed interpretation can be considered when the statute is capable of more than one construction. *Id.* Constructions that would render a statute productive of unnecessarily harsh consequences are to be avoided and any ambiguity in a statute should be resolved in favor of a reasonable operation of the law. *Id.* It therefore would follow that construction of the undefined terms of an administrative permit should be such so as to avoid unduly harsh results and the terms of the permit should be construed in a plain, obvious and reasonable manner.

▮ Indeed, some courts have gone so far as to hold that in suits involving a public administrative agency the rules and regulations of such agency should be strictly construed against it. *See Cole v. Young,* 351 U.S. 536, 556, 76 S.Ct. 861, 100 L.Ed. 1396 (1956); *Ferguson v. Union Nat'l Bank of Clarksburg,* 126 F.2d 753, 757 (4th Cir. 1942). Any ambiguities contained therein should be resolved in favor of the adversary. *State ex rel. Merrill v. Greenbaum,* 75 N.E.2d 598, 603 (Ohio Com.Pl.1947), *rev'd on other grounds,* 83 Ohio App. 484, 84 N.E.2d 253 (Ohio 1948); *Theodore v. State,* 407 P.2d 182, 189 (Alaska 1965), *cert. denied,* 384 U.S. 951, 86 S.Ct. 1570, 16 L.Ed.2d 547 (1966).

▮ Applying these rules to the facts of this case, it most likely appeared to the trial court that Westergard could have interpreted the phrase "area to be altered" as meaning the eastern bank of the river and that this area was required to have as much water diverted around it as possible rather than having the entire width of the channel diverted as the department urges. Our review of the record indicates that at least one of the department's agents, Mike Steel, also interpreted the work area to mean the same area that Westergard believed was affected by the terms of the permit. Finally, item No. 9 of the application, which was approved by the department, asks whether work is to be performed below the water surface. Westergard answered "yes," which would indicate that upon approval, the department acknowledged subwater work, so that the river in its entirety did not have to be diverted. To avoid unreasonable and harsh results, the trial court apparently construed the permit as did Westergard, and we see no error in the conclusion of law that Westergard's work was in compliance with the conditions of the permit.

We turn now to the second issue raised on appeal—namely, whether the record contains substantial evidence to support the district court's findings of fact and conclusions of law. The district court found, in addition to the findings and conclusions previously discussed, that the department's agent, Mike Steel, had ordered Westergard's contractor to cease work in the river, and that Steel's order to remove the tractor was made without reasonable justification, thereby creating the situation of which the department complains. In denying the department's motion for new trial and/or reconsideration, the district court held there were no direct violations shown and that the work was being done under the permit.

▮ In determining whether there was substantial evidence to support the district court, this Court must give due regard to the special opportunity of the trial court, acting as the fact finder, to judge the credibility of those witnesses. I.R.C.P. 52(a); *Roemer v. Green Pastures Farms, Inc.,* 97 Idaho 591, 548 P.2d 857 (1976). The determination of the credibility of witnesses and the weight to be given their testimony are exclusively within the province of the trier of facts. *Comish v. Smith,* 97 Idaho 89, 540 P.2d 274 (1975); *Pierson v. Sewell,* 97 Idaho 38, 539 P.2d 590 (1975).

At trial, Mr. Dunn, Administrator of the Operations Division for the department, testified that a temporary dike was contemplated by condition No. 5 of the permit. He also testified that, after Westergard had been ordered from the river, the department anticipated that the high flows of the river would, in all probability, wash out the dike. Mr. Whiting, Westergard's contractor, testified that the purpose of the dike was to divert water away from the east bank where the rip rap rock would be placed. He also testified that the dike was to be used as fill material at the bottom of the river next to the bank so that rip rap could be placed over it. More importantly, he testified that he had no intention of leaving the dike in the river and that he could have completed moving the dike over to the east bank within 6 to 8 hours, even though his operation would have been in high water.

The testimony of Westergard was that he was ordered from the river and that it was his understanding that such an order was permanent. True, Mr. Steel contradicted this by testifying that although he ordered Westergard out of the river, he did prohibit work on the dike, but did not so prohibit completion of work on the bank. Whiting testified that he did not know how Westergard could have completed the bank work without the use of the gravel dike as fill material, as expressly contemplated by item No. 6 of the application. Again there was a conflict presented by Mr. Steel's testimony that there was gravel material other than that within the dike which was available to Westergard.

The trial court decided these conflicts in Westergard's favor, and under the rule above stated we will not interfere, holding that there was substantial, although conflicting evidence, to support the trial court's findings of fact and conclusions of law. I.R.C.P. 52(a); *Heckman Ranches, Inc. v. State,* 99 Idaho 793, 589 P.2d 540 (1979); *Lewis-Clark Memorial Gardens, Inc. v. City of Lewiston,* 99 Idaho 680, 587 P.2d 821 (1978).

We affirm with costs to respondent.

SHEPARD, McFADDEN, and BISTLINE, JJ., concur.

BAKES, J., dissents without opinion.