788 P.2d 214

In re WESTERN ACCEPTANCE CORPO-
RATION, INC.; and Donald P. Chris-
tensen, Demandees, Investigative De-
mand No. 88-4, Attorney General of the
State of Idaho, Petitioners.

WESTERN ACCEPTANCE CORPORA-
TION, INC. and Donald P.
Christensen, Petitioners-Appellants,

v.

Jim JONES, Attorney General of the
State of Idaho, Respondent.

No. 17931.

Supreme Court of Idaho.

March 6, 1990.

Westberg, McCabe & Collins, Boise, for
petitioners-appellants. P. Larry Westberg,
argued.

Jim Jones, Atty. Gen., Holland & Hart,
Langroise, Sullivan, Boise, for respondent.
Brett T. DeLange, argued.

JOHNSON, Justice.

This is a Consumer Protection Act case.
The primary issue presented is whether the
collection of debts arising from sales of
goods and services·is subject to the provi-
sions of the Idaho Consumer Protection
Act (the Act), I.C. §§ 48-601 through -619.
We hold that the collection of these debts is
subject to the provisions of the Act, even
when the debts have been sold to a third
party by the seller and the collection is by
the third party.

We also hold that the attorney general is
not required personally to sign an investi-
gative demand issued by his office pursu-
ant to I.C. § 48-611, but that it may be
signed by a deputy attorney general.

I.

THE BACKGROUND AND PRIOR
PROCEEDINGS.

Western Acceptance Corporation, Inc.
(WAC) is in the business of purchasing

past due accounts receivable and dishonored checks from merchants. In June 1988 Donald P. Christensen, president of WAC, received an investigative demand issued in the name of the attorney general of the state of Idaho requesting information concerning the activities of Christensen, personally, and WAC in demanding, requesting or obtaining payments from thirty-six individuals in 1985, 1986, 1987 and 1988. WAC and Christensen filed a petition in district court to set aside or modify the investigative demand. As it relates to this appeal, the petition alleged that (1) the investigative demand had not been executed by the attorney general as required by the Act because it was signed by a special deputy attorney and (2) the activities of WAC and Christensen were not subject to the Act, since they were not engaged in advertising, offering for sale, selling, or distributing any goods or services directly or indirectly affecting the people of the state of Idaho.

The trial court ruled that there was no showing that the attorney general lacked the authority to appoint deputies to carry out the duties of the attorney general and that "debt collection, in whatever guise," is subject to the provisions of the Act. WAC and Christensen appealed these rulings.

## II.

### THE ATTORNEY GENERAL IS NOT REQUIRED TO SIGN AN INVESTIGATIVE DEMAND PERSONALLY.

WAC and Christensen assert that the Act requires the attorney general to sign an investigative demand personally, not through a deputy. We disagree.

I.C. § 48–611(1) provides that when the attorney general has probable cause to believe that a person has done, or is about to do, something that is declared to be unlawful by the Act, the attorney general "may execute in writing" an investigative demand requiring any person who is believed to have information relevant to the alleged or suspected violation to appear and testify or to produce the information. We do not interpret this provision to require the attorney general to sign the investigative demand personally.

I.C. § 67–1401 sets forth an extensive list of duties "of the attorney general." To require the attorney general personally to perform all of these duties would make the job of the attorney general an impossible one. One of these duties is "[t]o attend the supreme court and prosecute or defend all causes to which the state or any officer thereof, in his official capacity, is a party." I.C. § 67–1401(1) (1989). This Court has held that a notice of appeal in a case in which an officer of the state is a party does not have to be signed by the attorney general personally. *Caesar v. Williams*, 84 Idaho 254, 371 P.2d 241 (1962). The authority given to the attorney general under I.C. § 48–611 to issue an investigative demand is not sufficiently different to require the personal signature of the attorney general. In each case the attorney general has the power to act. In neither case does the legislation granting the authority indicate that the action must be taken by the attorney general personally.

WAC and Christensen contend that the authority to issue an investigative demand amounts to the delegation to the attorney general of a quasi-judicial function and that the issuance of the demand should require the signature of the attorney general for that reason. However, I.C. § 48–611(2) provides an immediate means for judicial intervention to extend the return date, or to modify or set aside the demand. Therefore, the demand does not constitute an unqualified power of the attorney general to require the presentation of the information sought. We see nothing in this formulation of the authority of the attorney general that causes us to believe that the legislature intended that the attorney general personally is required to sign the demand. If such a unique requirement were intended, we believe the legislation requiring it should be more specific than I.C. § 48–611(1).

## III.

### THE COLLECTION OF A DEBT ARISING FROM THE SALE OF GOODS OR SERVICES IS SUBJECT TO THE PROVISIONS OF THE ACT.

WAC and Christensen assert that their activities do not constitute "trade or

commerce" as defined in the Act and that they are, therefore, not subject to the provisions of the Act. We disagree.

The acts or practices that are unlawful under the Act are only those that are "in the conduct of any trade or commerce." I.C. § 48–603 (1977). "Trade" and "commerce" are defined by the Act to mean "the advertising, offering for sale, sale, or distribution of any goods or services, directly or indirectly affecting the people of this state." I.C. § 48–602(2) (1977). Our task here is to determine whether the legislature intended by this definition to include the collection of debts arising out of the sale of goods or services.

The legislature indicated that in construing the Act "due consideration and great weight shall be given to the interpretation of the federal trade commission and the federal courts relating to section 5(a)(1) of the federal trade commission act (15 U.S.C. § 45(a)(1))." I.C. § 48–604(1). We believe this direction indicates the intent of the legislature that the Act be liberally construed to effect the legislative intent "to deter deceptive or unfair trade practices and to provide relief for consumers exposed to proscribed practices." *State ex rel. Kidwell v. Master Distribs. Inc.*, 101 Idaho 447, 455, 615 P.2d 116, 124 (1980). We note that the federal trade commission has for many years interpreted 15 U.S.C. § 45(a)(1) to include debt collection. 16 C.F.R. § 237 (1989) (originally adopted in 1967); *State Credit Ass'n*, 86 F.T.C. 502 (1975); *American Credit Bureau, Inc.*, 84 F.T.C. 1582 (1974); *Sunshine Art Studios, Inc.*, 81 F.T.C. 836 (1972); *Wilson Chem. Co.*, 64 F.T.C. 168 (1964).

Construing the Act liberally in the manner the legislature indicated we should, we conclude that the collection of a debt arising out of a sale of goods or services is subject to the provisions of the Act, even when the collection of the debt is by a third party who has purchased the debt from the seller. It is the sale that brings the debt into existence that is the crucial event. Debts that do not arise out of the sale of goods and services subject to the provisions of the Act are not covered.

## IV.

### THE ATTORNEY GENERAL IS NOT ENTITLED TO ATTORNEY FEES FOR DEFENDING THIS APPEAL.

The attorney general asserts that we should award attorney fees for defending this appeal under I.C. § 48–608(3) or I.C. § 12–121. We disagree.

I.C. § 48–608(1) provides that a person who purchases or leases goods or services and thereby suffers loss of money or property as a result of a method, act or practice declared unlawful by the Act may bring an action in district court to recover damages. I.C. § 48–608(3) directs the court to award attorney fees to a prevailing plaintiff in the action and authorizes the court in its discretion to award attorneys fees to a prevailing defendant, "if it finds that the plaintiff's action is spurious or brought for harassment purposes only." This statute has no application to this action, which was initiated by a petition pursuant to I.C. § 48–611(2) to modify or set aside an investigative demand.

Under I.C. § 12–121 we will award attorney fees to a prevailing party in an appeal in a civil action where the appeal is brought or defended frivolously, unreasonably or without foundation. *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979). Here, the appeal has presented significant issues about which there are legitimate differences of opinion. Although we have resolved the issues in favor of the attorney general, this is not an appropriate case in which to award attorney fees.

## V.

### CONCLUSION.

We affirm the decision of the trial court that the debt collection in which WAC was engaged that was the subject of the investigative demand by the attorney general is within the definition of trade or commerce under the Act and that the attorney is not required to personally sign the demand.

We award costs to the attorney general but no attorney fees on appeal.

BISTLINE, BOYLE and McDEVITT, JJ., concur.

BAKES, C.J., concurs in Parts I and II.

BISTLINE, Justice, specially concurring.

Basically, I accept the views of District Judge Carey and the majority of this Court. Where I differ from the views of both Justice Johnson and Chief Justice Bakes is on their analysis of the business Christensen engages in, and his manner of conducting it. Apparently he deals in the acquisition of choses in action, primarily debts that for the most part have been created by contracts, express or implied.

For example, suppose Busy Bee Grocery is owed $850.00 by Joe Debtor and Christensen acquires an assignment of the debt. Christensen might in turn seek out some individual to whom he can sell Joe Debtor's debt, and might convince Jane Doe to buy it. Instead, Christensen approaches Joe Debtor and convinces Joe that his life will be better if he, Joe, buys up the debt. The right to recover a debt is a chose in action, and no law prohibits dealing in the business of buying and selling choses in action. Buyers of choses in action from anyone but the original creditor are bound to be hard to find. So, what better solution than to sell the debt to the original debtor? But Christensen is not easy on Joe; he extinguishes Joe's old debt by creating a new and greater debt. By apparently unfair business practices, a new debt is created which in amount, terms, and interest is more onerous than the original debt. Result: Christensen appears to be in violation of the I.C.P.A., because the I.C.P.A. clearly covers the sale of goods or services.

A debt clearly falls within the I.C.P.A.'s classification of "goods," and Christensen's "debt rearrangements" are a "service." Here, Christensen's business, although not improper if carried out properly, appears to have been unfair—as witnessed by those with whom he dealt:

Miss Kinsey received the initial demand letter from WAC in December. She says she tried to contact WAC, but got no answer. She was served papers about one month later. She went to see Christensen and was 'scared' when she heard him talking to someone on the phone about license plate numbers and where people were last seen. She says she felt like it was more like a private investigator's office. Because of her fear, and his comment that signing a promissory note would keep him from 'bothering her,' she signed the note. Terms: principal $1322, 11.78% interest, final $350 waived if paid as agreed, monthly payments $15 (payment arrangement effective for 90 days only, may be renewed).

R., 37. For checks totalling $54, WAC sought $804:

Ms. Vaquera says she never received the initial demand letter, but got a call at work in November or December of '87. Caller said the letter had been mailed to her former address. She says she had a forwarding notice in effect at post office. Ms. Vaquera asked the caller (apparently Christensen) not to contact her at work, but to call her at home. He got mad and said he would just take her to court. Was served papers at her residence at 11:30 p.m. on February 3 or 4, 1988. She has not signed a note or made any payments.

R., 38. In another instance, WAC sought $458 for an $8 check:

In October of 1987, Mr. Warth went to see Christensen about the bad check. He was informed that he would be responsible for paying back $491 to cover collection costs and attorney's fees (WAC filed a motion for dismissal of the complaint in November). Mr. Warth apparently signed a note for that amount, to be paid in $20 per month payments. In November, Mr. Warth was one day late making his payment, and Ms. Worth [sic] received a call from Christensen in which he allegedly said 'if I could have my way, I'd have the damn jerk who wrote the check thrown in jail.' Mr. Warth's son, Brad, who works for Credit Data, and is

knowledgeable about proper collection activities, went to see Christensen. Christensen allegedly told Brad to 'get the hell out of my office.' A total of $60 has been paid to WAC. * *Signed statements are on file.* *

R., 39. For $101 in checks, WAC filed for $753:

Ms. Camara was in the hospital as a result of a serious car accident when WAC contacted her mother last April. Christensen was apparently 'very rude' to her mother in phone conversations. After Ms. Camara got out of the hospital, she was served a demand letter and complaint (January '88). She contacted WAC and was told to come to their office. She made a $22 payment, and offered to make two $50 payments to pay off the debt. Christensen told her that she would have to sign a note, and that if she didn't pay $25 per month, she would 'go to jail.' Ms. Camara is afraid that she will be put in jail if she misses a payment. Has made $25 payment for February. Terms of note: principal—$753, monthly payment $25, interest 11.78%, final $250 (attorney's fees) waived if payments are made as agreed.

R., 40. For a $15 check, WAC initially sought $498, but later increased this to $682:

Mr. Pereira was advised by WAC that he 'owed' $198 plus $300 attorney's fees for a $15 returned check, and that since he couldn't pay the full amount, he had to sign a note, which he did (terms: principal $498, weekly payments of $25, interest at 18.81%, final $300 waived if payed [sic] as agreed). He was told that if he didn't sign the note, WAC would 'confiscate my automobiles plus everything I owned of value and throw me in jail.' Pereira made the first payment, but could only pay $15 the second week. He told Christensen he would make up the difference (and payed [sic] $35 and $40 the following weeks). Christensen agreed to the payments. After he had paid $185, he went to make the final payment and was told he still owed the $300 attorney's fees—because he defaulted the second week. At this point he decided not to make any more payments, and filed a complaint with A.G.'s office. WAC has filed a complaint asking for $682, consisting of $332 unpaid balance on note and $350 additional attorney's fees if judgment entered by default. * *Signed statement on file.* *

R., 40. Lastly:

Mr. Anderson has told me, and will testify, that he has offered on several occasions to pay CSI the face amount of the check, but each time he was refused. CSI would not accept less than the amount of the check plus $198 in triple damages.

R., 45. This triple amount was required in advance of any lawsuit.

As these excerpts from the record reveal, Christensen's business of dealing in goods by the apparent use of "strong arm" tactics and deceptive new debt arrangements falls clearly within the ambit of the I.C. P.A.

BAKES, Chief Justice, dissenting:

As to Part III of the majority opinion, I respectfully dissent.

The majority concludes in its opinion that the collection of a debt arising from the sale of goods or services is subject to the provisions of Idaho's Consumer Protection Act. That conclusion is based on the legislature's statement that in construing the Act "due consideration and great weight shall be given to the interpretation of the Federal Trade Commission and the federal courts," relating to the Federal Trade Commission Act. I.C. § 48–604(1); *ante* at 401, 788 P.2d at 216. From this statement the majority infers a legislative intent to construe the Act liberally to effectuate the Act's purposes, *i.e.*, "to deter deceptive or unfair trade practices and to provide relief for consumers exposed to proscribed practices." *Ante* at 401, 788 P.2d at 216. With this framework in mind the majority states, "It is the sale that brings the debt into existence that is the crucial event. Debts that do not arise out of the sale of goods and services subject to the provisions of the Act are not covered." *Ante* at 401,

788 P.2d at 216. In my view these reasons, neither independently nor collectively, are sufficient to overcome the plain wording of the statute.

First, a general admonition to construe the Act liberally, if that admonition in fact be warranted, is not a license to augment, alter or expand the plain words of the statute. The cardinal rule of statutory construction is that where a statute is plain, clear and unambiguous, we are constrained to follow that plain meaning and neither add to the statute nor take away by judicial construction. *Moon v. Investment Board,* 97 Idaho 595, 548 P.2d 861 (1976); *Higginson v. Westergard,* 100 Idaho 687, 604 P.2d 51 (1979). Subsection (2) of I.C. § 48–602, as noted by the majority, sets forth the definition of trade or commerce. That section provides:

> (2) "Trade" and "commerce" means the advertising, offering for sale, sale, or distribution or any goods or services, directly or indirectly affecting the people of this state.

The record in this case demonstrates that WAC did not advertise, did not offer for sale, and did not sell or distribute any goods or services, directly or indirectly affecting the people of this state. As the majority opinion itself recognizes, "(WAC) is in the business of purchasing past due accounts receivable and dishonored checks from merchants." *Ante* at 399–400, 788 P.2d at 214–15. It appears self evident that WAC does not fit within the plain meaning of the statutory definition of trade or commerce, and this reading takes on more credibility when read in conjunction with the list of seventeen prohibited activities entitled "unfair methods and practices" at I.C. § 48–603. Neither the respondent in this case, nor the majority opinion, indicates which of these provisions would be applicable to WAC, even if we assume WAC is covered by the Act. The seventeen listed prohibitions all deal in some manner with unfair and deceptive practices used by *sellers to effect a sale.* Subsection (17) of I.C. § 48–603, the Act's "catchall" provision, reads: "(17) Engaging in any act or practice which is otherwise misleading, false, or *deceptive to the consumer."* (Emphasis added.) The term "consumer" is a relational term. The thirty-six petitioners in this case were all at one point consumers in relation to a particular merchant or seller, but they are not consumers with respect to their relation to WAC. Therefore, not even the Act's catchall provision would be applicable to the activities and conduct of WAC. It therefore makes no sense to say that WAC is covered by the Act when none of the Act's prohibitions are even remotely applicable to WAC.

It is true that "due consideration and great weight" are to be given to the rulings of the FTC and the federal courts in their interpretation of similar provisions under the federal Act, but too much weight is given to FTC rulings when those rulings are predicated on provisions of the federal Act dissimilar to Idaho's. The definition of "trade and commerce," as explained above, deals with the advertising, distribution, and sale of goods and services. That definition differs substantially from the language contained in the federal counterpart which speaks in terms of conduct or practices "in or affecting commerce." 15 U.S.C. § 45(a)(1). Whereas Idaho's definition narrowly focuses on the activities of sellers, the broader definition contained in the federal Act could reasonably be interpreted to encompass debt collection activities which certainly may "affect commerce."

Most troubling, however, is the majority's statement that, "It is the sale that brings the debt into existence that is the crucial event. Debts that do not arise out of the sale of goods and services subject to the provisions of the Act are not covered." *Ante* at 401, 788 P.2d at 216. If debt collection activities are brought within the Act's umbrella merely because they "arise out of" an underlying sale, can we thereby assume that any activities bearing some connection to a sale, no matter how remote or attenuated the connection may be, are within the Act's coverage? Is an attorney, retained by a seller to bring suit to enforce payment of a delinquent debt, subject to the Act's coverage? Is a person or business exercising self-help rights of repossession under the UCC, an area permeated

with deceptive tactics, within the Act's amorphous scope? In my opinion, these activities, like those of WAC in the instant case, would not be covered by the Act because the plain words of the statute cannot be construed reasonably to cover such activities.