W. JONES, Justice.
I. Nature of the Case
The Idaho State Tax Commission (“the Commission”) appeals the Judgment of the district court, holding that PacifiCorp, an Oregon corporation, proved by a preponderance of the evidence that the Commission’s *761 valuation of its taxable operating property in Idaho was erroneous pursuant to I.C. § 63-409(2). The Commission contends that the district court’s decision is not supported by substantial and competent evidence because the appraisal methodologies utilized by PacifiCorp’s appraiser are so unreliable as to amount to incompetent evidence.
II. Factual and Procedural Background
PaeifiCorp is a regulated electric utility that operates hydroelectric, wind, and thermal generating plants in Arizona, California, Colorado, Idaho, Montana, Oregon, Utah, Washington, and Wyoming. It provides electrical power to approximately 7.1 million customers. PaeifiCorp also owns, or has interests in, electric transmission and distribution assets.
On March 21,2006, a wholly owned subsidiary of MidAmerican Energy Holdings Company (“MidAmerican”) acquired 100% of the common stock of PaeifiCorp from a wholly owned subsidiary of ScottishPower, pic, (“ScottishPower”), a public limited company in the United Kingdom, for a reported value of $9,200,000,000 — of which $5,100,000,000 was paid in cash with $4,100,000,000 in net debt and preferred stock to remain outstanding. ScottishPower primarily caused its subsidiary to sell PaeifiCorp due to a forecasted $5,000,000,000 investment needed over the next five years to update its infrastructure. As such, PacifiCorp’s current business profile did not match well with its investors’ expectations for dividends and returns.
As a result of the sale, MidAmerican through its subsidiary now controls all the voting securities of PaeifiCorp, including all of its common and preferred stock. MidAmerican is a subsidiary and holding company of Berkshire Hathaway, Inc. (“Berkshire Hathaway”), and is engaged in the energy business. Berkshire Hathaway primarily caused its subsidiary to purchase PaeifiCorp as part of its long term investment strategy in electric power.
PaeifiCorp is subject to comprehensive regulation by the Federal Energy Regulatory Commission (“FERC”) and other local, state, and federal regulatory agencies. FERC requires PaeifiCorp to submit a FERC Financial Report. This report includes FERC Form No. 1, which comprises an annual regulatory financial reporting requirement of major electric companies, and FERC Form No. 3-Q, which is a quarterly regulatory requirement that supplements the financial reporting requirement (hereinafter FERC Form No. 1 and FERC Form No. 3-Q shall be referred to collectively as “the FERC Form”). 18 C.F.R. §§ 141.1, 141.400 (2007). Several provisions in the FERC Form account for depreciation. The Code of Federal Regulations, in 2007, defined “depreciation” as applied to a depreciable electric plant as follows:
[T]he loss in service value not restored by current maintenance, incurred in connection with the consumption or prospective retirement of electric plant in the course of service from causes which are known to be in current operation and against which the utility is not protected by insurance. Among the causes to be given consideration are wear and tear, decay, action of the elements, inadequacy, obsolescence, changes in the art, changes in demand and requirements of public authorities.
18 C.F.R. § 101.12 (2007) (emphasis added). Both parties dispute whether “depreciation” in the FERC Form accounts for (1) all forms of obsolescence, or (2) merely depreciation and functional obsolescence, which is “[ojbsolescence that results either from inherent deficiencies in the property ... or from technological improvements available after the use began.” Black’s Law Dictionary 1182 (9th ed. 2009).
PaeifiCorp’s rates are based on a revenue requirement that the Idaho Public Utilities Commission (IPUC) determines should provide it with the opportunity to recover its operating costs and earn a reasonable market return on its invested capital (“the rate base”).[1] The rates are not subject to change unless a new rate case is filed with the IPUC and the IPUC orders a modified rate base. Rate regulation also affects PacifiCorp’s *762 earnings because the investments allowed to be included in the rate base vary between jurisdictions. For example, the IPUC excludes assets financed with deferred income taxes from the rate base. PaeifiCorp has also incurred increased operating costs and engaged in significant investments in property and equipment that are not automatically included in the rate base due to the infrequencies of rate cases and regulatory lag. PaeifiCorp contends that primarily because of rate regulation, its average net rate of return on its plant in service has been 7.2% over the five years immediately preceding January 1, 2008, while the investor required rate of return for the regulated electric utility industry has been 9.1%. As a result, PacifiCorp contends that its net rate of return or actual rate of return as of January 1, 2008, was 20.88% less than the market rate of return.
For ad valorem tax purposes, operating property in Idaho is annually assessed at market value as of 12:01 a.m. of the first day in January in the year in which such property taxes are levied. I.C. § 63-205(1). The tax involved in this appeal is the ad valorem property tax on PacifiCorp’s operating property in Idaho as of the valuation date of January 1, 2008. With regard to electric utilities, “operating property” includes
[A]ll rights-of-way accompanied by title ... and all immovable or movable property operated in connection with any public utility ... wholly or partly within this state, and necessary to the maintenance and operation of such road or line, or in conducting its business, and shall include all title and interest in such property, as owner, lessee or otherwise____[2]
1.C. § 63-201(15) (2007). Market value is defined as follows:
[T]he amount of United States dollars or equivalent for which, in all probability, a property would exchange hands between a willing seller, under no compulsion to sell, and an informed, capable buyer, with a reasonable time allowed to consummate the sale, substantiated by a reasonable down or full cash payment.[3]
I.C. § 63-201(14) (2007). In determining market value, an assessor will consider the comparable sales approach, the cost approach, and the income approach. IDAPA 35.01.03.217.02. Furthermore, with regard to an electric utility’s operating property, the unit method of market valuation is preferred. IDAPA 35.01.03.405.01. The unit method values operating properties by measuring their contribution to the overall unit. Under the unit method, “the value of the tangible and intangible property is equal to the value of the going concern ---- For interstate property, allocation factors shall be used to determine what part of the system value is in Idaho.” Id. “The appraiser shall attempt to measure obsolescence, if any exists. If obsolescence is found to exist, it may be considered in the cost approach.” IDAPA 35.01.03.405.05.C. Obsolescence is defined as “[a] diminution in the value or usefulness of property____” Black’s Law Dictionary 1182 (9th ed. 2009). For tax purposes, obsolescence is usually distinguished from physical deterioration or depreciation. Black’s Law Dictionary 1182 (9th ed. 2009). External obsolescence (also referred to as economic obsolescence) “results from external economic factors, such as decreased demand or changed governmental regulations.” Black’s Law Dictionary 1182 (9th ed. 2009).
On June 16, 2008, the Commission completed an appraisal of PacifiCorp’s operating property for the tax year beginning on January 1, 2008, which was prepared by Jerott Rudd, Senior Appraiser with the Commission’s Central Assessment Bureau. With regard to the cost approach, Rudd utilized the historic cost less depreciation methodology (“HCLD Method”), which is a commonly employed cost approach. To arrive at his cost approach estimate, Rudd primarily relied on PacifiCorp’s FERC Form for the period end *763 ing in December 31, 2007. Rudd did not provide a separate deduction for external obsolescence. He elaborated that “[he] believe[s] ... [external obsolescence] was accounted for ... in the depreciation [as reported in the FERC Form]. Rudd testified that market to book value is a strong indicator of obsolescence.” Rudd also testified that he would have considered accounting for additional external obsolescence if there was market evidence to support such a deduction, but he added “[that] ... the market evidence that [he] had for PacifiCorp ... did not indicate obsolescence.”
Rudd’s appraisal estimated a cost approach market value of $11,122,536,280. With regard to the income approach, Rudd utilized the yield capitalization of net operating income methodology (“Yield Capitalization Method”) to arrive at his estimate of $6,761,521,809. Rudd did not employ the comparable sales approach because he contended that there were no comparable sales of similar operating properties. Rudd did not utilize the comparable sales approach’s counterpart, the stock and debt approach, which is often used by appraisers when the comparable sales approach is inapplicable, because PaeifiCorp’s stock is not outstanding and because of the significant premium which MidAmerican paid for the investment value of PacifiCorp.
Rudd placed a 45% weight on his cost approach estimate and a 55% weight on his income approach estimate, resulting in a unit value of $9,273,982,721. He explained why he applied those weights to the cost and income approaches:
Historically, for many years, the Tax Commission applied a 50/50 weighting to the cost and income for electric utility properties. That 50/50 weighing I believe was upheld by the Board of Equalization decisions in the past. In 2007, I ... changed the weighting slightly to a 45/55 weighting. I felt that I could still do that.
Rudd reduced the market value by $240,761,350 for the value of PacifiCorp’s non-taxable intangible property. He multiplied that figure by the Idaho allocation factor of 3.745822% (“the allocation factor”) to obtain an Idaho allocated value of $338,368,433. Additional adjustments for various deductions and exemptions resulted in a final estimated Idaho taxable valuation of $263,667,243.
PacifiCorp appealed Rudd’s appraisal to the Commission, pursuant to I.C. § 63-407, asserting that it was entitled to an adjustment for functional and external obsolescence in the cost approach, and that the capitalization rate applied in Rudd’s appraisal incorrectly estimated the cost of equity. The Commission held that the market value of PacifiCorp’s operating property was to be set at $8,877,075,014 for ad valorem tax purposes. It further ordered that the Idaho taxable value for that property was to be set at $252,382,819. In reaching its valuation, the Commission determined that 7.93% should be deducted from the cost approach valuation for additional obsolescence, resulting in a cost approach value of $10,241,519,153. No adjustments were made to Rudd’s income approach estimate. After weighing the Commission’s adjusted cost approach valuation and Rudd’s unadjusted income approach valuation by 45% and 55%, respectively, the Commission concluded that for the 2008 tax year, the market value of PacifiCorp’s operating property was $8,877,075,014, which was reduced by $230,457,249 for the value of non-taxable intangible property. The result was then multiplied by the allocation factor and additional adjustments for various deductions and exemptions were made, resulting in a final Idaho taxable value of PaeifiCorp’s operating property of $252,382,819.[4]
Thereafter, PacifiCorp timely filed a Petition for Judicial Review, pursuant to I.C. § 63-409, with the district court on September 24, 2008, contending that the Commission’s valuation was erroneous. At trial, PacifiCorp relied primarily on the appraisal of Thomas K. Tegarden of Tegarden & Associates, Inc., an MAI appraiser and expert in *764 utility valuation. Norman Ross,[5] a Tax Director with PacifiCorp, who is accredited in business valuation and a certified public accountant, and Steven MeDougal,[6] Director of Revenue Requirements with PacifiCorp, also provided their expert opinions as to the validity of Tegarden’s appraisal and the value of PacifiCorp’s operating property at trial.
In his appraisal, Tegarden estimated that the fair market value of PacifiCorp’s operating property was $8,350,000,000. Tegarden utilized the same valuation methodologies for the cost and income approaches that were employed by Rudd: the HCLD Method and Yield Capitalization Method, respectively.[7] Tegarden did not utilize the comparable sales approach or the stock and debt approach. Concerning his decision not to employ the comparable sales approach, Tegarden stated that there is very limited actual sales data for valuing public utilities in general and that the 2006 sale of PacifiCorp represented a significant investment value premium. When PacifiCorp was sold in 2006, Scottish-Power wanted to unload PacifiCorp, which it acquired in 1999, because it would have had to invest $5,000,000,000 in infrastructure over the next half decade, which would take away cash dividends from its investors. Scottish-Power was also concerned about the movement in the United States away from deregulation and PacifiCorp’s inability to achieve a market required rate of return. Tegarden recognized that Berkshire Hathaway caused its subsidiaries to purchase PacifiCorp to further its long term investment strategy in electric utilities, and that the price paid for PacifiCorp represented more of an investment value price rather than the market value price of PacifiCorp. With regard to the stock and debt approach, Tegarden stated that this approach was inapplicable for many of the same reasons the comparable sales approach was inapplicable and because PacifiCorp had no securities outstanding.
With regard to Tegarden’s cost approach, he estimated that the value of PacifiCorp’s operating assets was $8,811,000,000. Tegarden used the figures supplied in the FERC Form to determine the historical cost of the operating assets and the physical depreciation and functional obsolescence of those assets, resulting in a figure of $11,135,919,587. He thereafter made adjustments for external obsolescence, which he contends amounted to an additional 20.88% deduction, or $2,325,180,010. Tegarden arrived at his external obsolescence estimate by using the capitalization of income loss method, which is a generally accepted methodology. Tegarden characterized external obsolescence as the loss in value due to causes outside of the property, including the effect of supply and demand, government regulation, changes in operating costs, changes in interest rates, changes in employment, effect of zoning, the political climate, credit markets, and environmental concerns, among others. Tegarden testified that historically the most important factor for a utility, though, was government regulation. The theory behind Tegarden’s method of measuring external obsolescence is that “a willing, informed buyer of a regulated utility will expect a market rate of return of net operating income.” If the net operating income of the utility is more than the market rate of return, this will be reflected in external appreciation of the value *765 of the operating property. On the other hand, if the net operating income is less than the market rate of return, this will be reflected in external depreciation of the value of the operating property. Tegarden contends that PacifiCorp’s net operating income over the immediately preceding five-year period was 7.2%, while the net operating income for PacifiCorp’s peer group, the expected market rate of return on net operating income, was 9.1%, resulting in a 20.88% negative difference between PacifiCorp’s rate of return and the market rate of return.[8] This figure was rounded from 20.879%. Treating the 20.88% negative difference as economic obsolescence, Tegarden made an additional deduction of $2,325,180,010 in addition to the FERC Form’s depreciation ($11,135,919,587 x 20.88% = $2,325,180,010 (which was presumably rounded from $2,325,180,009.7656)), resulting in a cost approach estimate of $8,810,739,577 ($11,135,919,587 $2,325,180,010 = $8,810,739,577 ).[9] Tegarden then rounded his cost approach estimate to $8,811,000,000.
With regard to Tegarden’s income approach, he used the Yield Capitalization Method. The Yield Capitalization Method involves a determination of value based on cash flow divided by a capitalization rate of growth. Tegarden estimated cash flow, or net operating income, to be around $750,000,000, which included income for the existing plant, construction work in progress, and rate changes. He further estimated that the capitalization rate[10] was 9.10%, resulting in a valuation estimate of $8,242,000,000.[11] Tegarden applied a 19% weight to the cost approach and a 81% weight to the income approach, resulting in a valuation of PacifiCorp’s operating property as of January 1, 2008, of $8,350,000,000 (19% x $8,811,000,000 (cost approach) + 81% x $8,212,000,-000=$8,350,110,000, which was rounded to $8,350,000,000 ).[12]
When asked why he afforded an 81% weight to his income approach estimate and only a 19% weight to his cost approach estimate, Tegarden stated that “investors in these types of properties are more concerned about the future and what can be earned, the cash flow they can expect. They’re not as concerned about historical cost, what was paid for the property. That’s water over the dam.”[13] To determine the market value of *766 PaeifiCorp’s operating property in Idaho as of January 1, 2008, Tegarden accounted for the allocation factor and made various adjustments similar to those employed by Rudd to arrive at an estimate of $230,680,003.
Thereafter, the Commission presented its case and relied primarily on the appraisal and testimony of Rudd; the appraisal and testimony of D. Brent Eyre, a certified appraiser licensed in Utah and Washington; and the testimony of Dr. Ben Johnson, a consulting economist with Ben Johnson Associates, Inc.[14] In his appraisal, Eyre utilized the stock and debt approach. He also employed the HOLD Method with regard to his cost approach and the discounted cash flow methodology (“Discounted Cash Flow Method”) with regard to his income approach. At trial, Eyre disagreed with both Rudd’s and Tegarden’s appraisals because they did not utilize the comparable sales approach or the stock and debt approach to valuation, contending that they could have factored in the sale of PaeifiCorp to MidAmerican in March of 2006. Eyre also disagreed with Tegarden’s deduction for external obsolescence, contending that the depreciation reported in the FERC Form accounts for all forms of obsolescence and that Tegarden’s cost and income approaches should have factored in deferred income taxes as a form of additional income.
Eyre testified that the market to book value ratio, which the FERC Form presents a strong indication of, generally accounts for all forms of obsolescence. Under cross-examination, Eyre admitted that depreciation studies, from which the depreciation figures in the FERC Form are calculated, generally occur every four or five years. Regarding the main differences between Tegarden’s and Eyre’s income approaches, Tegarden factored in float costs with regard to the Yield Capitalization Method while Eyre accounted for around a 2% rate of growth in perpetuity in his net operating income calculation with regal’d to the Discounted Cash Flow Method. After weighing his estimates accordingly, Eyre arrived at a cost approach estimate of 11,135,900,000, which was afforded a 20% weight; an income approach estimate of $11,372,200,000, which was afforded a 50% weight; and a stock and debt approach estimate of $11,393,700,000, which was afforded a 30% weight, resulting in an estimated unit value for all of PacifiCorp’s 2008 operating property of $11,007,000,000 and an Idaho taxable value, after the allocation factor and the adjustments were made, of $412,300,000.
The district court entered its Memorandum of Findings of Fact and Conclusions of Law on September 16, 2010, holding that PaeifiCorp established by a preponderance of the evidence that the Commission’s valuation was erroneous.[15] The district court then entered its Judgment on October 19, 2010. The Commission thereafter timely filed its Notice of Appeal on November 24, 2010, and *767 Amended Notice of Appeal on December 13, 2010.
III.Issue on Appeal
The issue on appeal is whether the district court’s Judgment is clearly erroneous when it rejected the Commission’s valuation approach and adopted PacifiCorp’s valuation approach.
IV.Standard of Review
PaeifiCorp filed its Petition for Judicial Review of the Commission’s appraisal of its operating property in the district court pursuant to I.C. § 63-409. Subsection (1) of that statute provides that “[t]he appeal may be based upon any issue presented by the taxpayer to the state tax commission and shall be heard by the district court in a trial de novo without a jury in the same manner as though it were an original proceeding in that court.” In any appeal taken pursuant to I.C. § 63-409, the burden of proof to establish by a preponderance of evidence that the valuation is erroneous falls on the party seeking affirmative relief. I.C. § 63-409(2).
The district court held that PacifiCorp established by a preponderance of the evidence that the Commission’s valuation was eiToneous. “Findings of fact will not be set aside on appeal unless they are clearly erroneous.” Kennedy v. Schneider, 151 Idaho 440, 442, 259 P.3d 586, 588 (2011). This Court recognizes that “[a] trial court’s findings of fact will be upheld on appeal[, and, therefore, are not clearly erroneous,] if the findings are supported by substantial and competent evidence. It is the province of the trial judge to weigh the conflicting evidence and testimony and to judge the credibility of witnesses.” The Senator, Inc. v. Ada Cnty. Bd. of Equalization, 138 Idaho 566, 569, 67 P.3d 45, 48 (2003). “This Court exercises free review over the district court’s conclusions of law to determine whether the court correctly stated the applicable law and whether the legal conclusions are sustained by the facts found.” Kennedy, 151 Idaho at 442, 259 P.3d at 588.
V.Analysis
A. The District Court’s Judgment was not clearly erroneous.
In its opening brief, the Commission provides a list of reasons why it believes that Tegarden’s cost approach to valuation is unreliable and therefore incompetent. As the district court recognized, this appeal represents, in many respects, “a battle of the experts.” The district court was faced with the difficult task of evaluating competing theories of valuation that, for the most part, utilized generally accepted valuation theories. All the experts testified that their subjective appraiser judgments were utilized within the bounds of their respective professional standards. The experts for PaeifiCorp and the Commission each have considerable experience in their particular fields. As such, the district court correctly understood that its only task was to “listen[ ] to each witness as he gave live testimony and was subjected to rigorous cross examination,” and then render its decision after weighing the credibility of the experts, their appraisals, and their theories. The district court noted that it “was especially impressed by Mr. Tegarden and found his testimony and opinions to be more credible, more reliable, more persuasive, and entitled to greater weight than the testimony and opinions of the witnesses for the Tax Commission.” Furthermore, the court determined that the criticisms of Tegarden’s valuations were unconvincing.
On appeal the Commission argues that the Tegarden approach is so unreliable it is not competent evidence. But the Commission did not challenge the competency of Tegarden’s testimony in the district court. Each of the arguments presented by the Commission relate solely to the credibility of expert witnesses, the probative value of their appraisals, and the utilization by the experts of their appraiser judgments in applying those theories. The Commission has generally not provided this Court with any arguments relating to the district court’s conclusions of law, which this Court can review de novo. Instead, the Commission’s qualms with Tegarderis approach are factual in nature and go towards rebutting the credibility of Tegarden’s testimony and his appraisal.
*768 It is widely recognized that “evidence in order to be admissible must be competent, relevant, and material.” E.g., 53 C.J.S. Libel and Slander; Injurious Falsehood § 335 (2012) (emphasis added); 53 C.J.S. Licenses § 114 (2012); 29A C.J.S. Eminent Domain § 600 (2012); see also Black’s Law Dictionary 635 (9th ed. 2009) (“admissible evidence ... Also temed competent evidence ... ”); Black’s Law Dictionary 639 (9th ed. 2009) (“relevant evidence ... also temed competent evidence.”). The Idaho Rules of Evidence provide that “[ejrror may not be predicated upon a ruling which admits or excludes evidence unless ... a timely objection or motion to strike appears of record, stating the specific ground of objection....” Idaho R. Evid. 103.
On appeal, it is asserted that competency of evidence and credibility of witnesses are one and the same — that is incorrect. Competency is an evidentiary prerequisite to admission. If evidence is incompetent, it is the opponent’s obligation to object to that evidence when offered for admission. Idaho R. Evid. 103. This Court will not consider objections to the admission of evidence that are not preserved in the record and that are raised for the first time on appeal. E.g., State v. Perry, 150 Idaho 209, 224, 245 P.3d 961, 976 (2010) (“Generally Idaho’s appellate courts will not consider error not preserved for appeal through an objection at trial.”). If the methods employed by Tegarden were so unreliable as to render them incompetent, then an objection to that effect should have been lodged with the district court when offered. But because the Commission failed to object and challenge the competency of Tegarden’s approach below, this Court will not evaluate whether Tegarden’s approach is competent. Instead this Court will assume that the evidence and testimony admitted in the trial court and not challenged as incompetent by the Commission is competent. Therefore, this Court’s inquiry is limited to whether the district court’s decision, based on the testimony and evidence received and not objected to, was clearly erroneous.
This Court, when it reviews a district court’s decisions will uphold the trial court’s factual findings unless clearly erroneous. Idaho R. Civ. P. 52(a). We recognize that “[i]t is the province of the trial judge to weigh the conflicting evidence and testimony and to judge the credibility of witnesses.” The Senator, Inc., 138 Idaho at 569, 67 P.3d at 48. Evidence is substantial if “a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been proven.” Id. This Court will not reweigh the evidence on appeal. Gooby v. Lake Shore Mgmt. Co., 136 Idaho 79, 82, 29 P.3d 390, 393 (2001).
The Commission asserts that Tegarden’s appraisal is unreliable because his external obsolescence deduction was duplicative because the FERC Form properly accounted for all forms of obsolescence. The Commission also contends that Tegarden’s appraisal is unreliable because it assumes that PacifiCorp will always lose money and does not sufficiently account for PacifiCorp’s deferred income taxes. Furthermore, the Commission claims that Tegarden’s appraisal is unreliable because it failed to employ either the comparable sales approach or the stock and debt approach to valuation and because it never specified the respective weights it employed when it reconciled the cost and income approaches, unlike the district court. Finally, the Commission argues that Tegarden’s appraisal is unreliable because it is too subjective. As mentioned, the reliability of Tegarden’s approach was an issue for the trial court to decide after weighing evidence and considering the testimony and credibility of the witnesses. For the reasons discussed below, the district court’s decision finding Tegarden’s approach more reliable than the approached proposed by the Commission was not clearly erroneous.

1. It Was Not Clearly Erroneous For the District Court to Conclude That External Obsolescence Is Not Sufficiently Accounted for in the FERC Form.

The Commission argues that because PacifiCorp’s self-reported depreciation in the FERC Form already includes “obsolescence,” it is improper for PacifiCorp to *769 provide another deduction. With marginal elaboration, the Commission, as support for its proposition that depreciation in the FERC Form accounts for external obsolescence, cites to Title 18, Part 101 of the Code of Federal Regulations, which includes the term “obsolescence” within the definition of “depreciation.”
Indeed, that statute does include “obsolescence” in its definition of depreciation. Evidence was presented at trial suggesting that “obsolescence,” as applied in that statute, does not provide for all forms of obsolescence, including external obsolescence. All of the appraisers asserted that “obsolescence” in the FERC Form generally accounts for book depreciation of the operating assets and functional obsolescence, not external obsolescence. The Commission never rebutted these assertions. The Commission’s expert appraisers both admitted that they would have accounted for external obsolescence had they found market evidence to support those deductions, suggesting that they understood that the FERC Form did not incorporate all forms of obsolescence. On this point Dr. Johnson testified as follows:
We know that in principle the intent of the regulatory process is to pick up all significant forms of obsolescence. There is no intent to exclude economic obsolescence [from the FERC Form]. But as to whether it, in fact, precisely picks up every possible form of obsolescence, I don’t think you can assert that. I think it would be very fact specific as to the extent to which an independent judgment of obsolescence would or would not match the accounting rales.
In addition, the Commission’s experts admitted that depreciation studies, which provide the basis for the depreciation figures in the FERC Form, generally occur every four or five years. Based on this testimony and the Commission’s inability to provide adequate authority rebutting these assertions, we conclude that it was not clearly erroneous for the trial court to determine that “obsolescence,” as it is defined in the FERC Form, does not account for economic obsolescence.

2. It Was Not Clearly Erroneous for the District Court to Accept Tegarden’s Approach Despite the Commission’s Arguments that Tegarden’s Appraisal Assumes that PacifiCorp Will Always Lose Money and That Tegarden Should Have Considered PacifiCorp’s Deferred Income Taxes In His Cost of Capital Projection.

The Commission contends that because Tegarden and MeDougal testified that PacifiCorp will never recover its cost of capital from the rate base, Tegarden’s appraisal is unreliable.[16] The Commission also asserts that Tegarden’s appraisal is unreliable because it assigns no value to PaeifiCorp’s deferred income taxes. As support for its assertion, the Commission cites broadly to a confidential memorandum expressing PacifiCorp’s confidence in its future financial prospects. It also points out that Dr. Johnson testified that by taking deferred income taxes into account, PacifiCorp’s “real cost of capital is approximately ... 7%, not 9.1%.”
At trial, the Commission did not challenge the methods of Tegarden as incompetent — it now seeks to do so. Because the Commission failed to challenge the competency of the Tegarden approach below, we will not decide whether it was competent; only whether it was clearly erroneous for the trial court to conclude that it was more reliable than the approaches advanced by the Commission. The reliability and credibility of the methods employed are questions of fact that the district court was required to weigh and evaluate — to which we grant deference. In this “battle of the experts” the district court weighed the testimony and methods of each expert. After doing so, it found the Tegarden approach more reliable.
The Commission proposes that Tegarden’s appraisal is unreliable because it assumes that PacifiCorp will never recover its cost of capital from the rate base. The Commission points to a few statements in the transcripts *770 made by Tegarden. Those statements do not describe PaeifiCorp’s failure to recover its cost of capital in perpetuity. Tegarden’s appraisal provided a cost of capital estimate of 9.1%, as of January 1, 2008. He utilized the band of investment technique to reach his cost of capital estimate. Furthermore, the record asserts that PacifiCorp has not been recovering its cost of capital from the rate base for a number of years. Tegarden’s appraisal reflects those deficiencies. The Commission asserts that his projections suggest that PacifiCorp will never recover its cost of capital. As mentioned before, Tegarden’s appraisal reflects that PacifiCorp has been unable to recover its cost of capital from its base rate as of January 1, 2008. The district court’s finding that Tegarden’s appraisal does not assert that PacifiCorp will never recover its cost of capital from its base rate is not clearly erroneous.
The Commission also bases its argument on appeal on Dr. Johnson’s assertion that by classifying PacifiCorp’s deferred income taxes as net operating income, it would necessarily change Tegarden’s cost of capital calculation to 7%, as opposed to 9.1%. Dr. Johnson is an economist, not an appraiser or an accountant. Dr. Johnson testified that he was not rendering any opinion of value. He testified that “[a]s an economist and an observer of market values through my work, I have some understanding of market values. And I believe based on that understanding of market values that some of the discussion that’s taking place, allegations of external obsolescence because of regulation, are mistaken.” He further testified that he never provided a cost of capital study and that his projections only represent his opinions. Even though the Commission assured the district court that Dr. Johnson’s testimony was not intended to establish valuation, the Commission seems intent on using it for that purpose on appeal. Despite the continued invitations to reweigh the evidence on appeal, this Court will not do so. It was not improper for the trial court to determine that Johnson’s testimony had very little, if any, probative value in establishing the reliability of Tegarden’s approach.
Finally, concerning the confidential memorandum, the Commission does not provide any argument as to the substantive value of that document with regard to Tegarden’s appraisal. Instead, the Commission merely states that if this Court were to read that document, the “Holmesian mystery” of PacifiCorp’s market value will be solved. Yet, it was not clearly erroneous for the trial court to decide that future earnings envisioned in a ten year plan does not indicate value in any of the aforementioned approaches to valuation.

3. It Was Not Clearly Erroneous for the District Court to Find Tegarden’s Appraisal Reliable Even Though it Does Not Utilize the Comparable Sales or Stock and Debt Approaches to Valuation.

The Commission contends that Te-garden’s appraisal is unreliable because he did not employ either the comparable sales approach or stock and debt approach to valuation. The Commission claims that, pursuant to I.C. § 63-201(15) and IDAPA 35.01.03.217.02 (2007), Tegarden should have considered the $9,200,000,000 sale of PacifiCorp to MidAmerican’s subsidiary in March of 2006 in its valuation.
Tegarden determined that the comparable sales approach and the stock and debt approach to valuation had limited usefulness with regard to determining the market value of PaeifiCorp’s operating property. With regard to the comparable sales approach, he asserted, “[t]here is a very limited amount of actual sales data to be used as an evidence of value for the valuation of major going-concern business enterprises such as public utilities.” He further recognized that the comparable sales approach generally provides the primary indicator of market value in appraisals of properties that are not purchased for their income producing characteristics, that frequently sell in the market place, and that are the result of arm’s length transactions between reasonably informed buyers and sellers. None of the experts refute that PacifiCorp was purchased by a subsidiary of MidAmerican as a long term investment, and that the sale price of PacifiCorp more accurately represented long-term investment value as opposed to market value. In fact, the parties don’t dispute that around $1,074,000,000 of PacifiCorp’s sale price represents intangible goodwill.
*771 Tegarden did consider the comparable sales approach in his assessment of valuation and determined that it was not useful. Although the Commission’s expert, Eyre, employed the stock and debt approach, the district court, Rudd, and Tegarden recognized that it had limited usefulness, primarily because PaeifiCorp has no outstanding shares of stock and because of the large premium paid for PacifiCorp’s shares of common stock. The Idaho Administrative Code does not require the use of the comparable sales approach. IDAPA 35.01.03.217.02 (2007). It requires only that an appraiser “will consider” that approach when making his or her appraisal. The district court, Rudd, and Eyre all choose not to use the comparable sales approach for the same reason that Te-garden did not utilize that approach. Therefore, it was not clearly erroneous for the district court to find Tegarden’s appraisal rehable; despite not utilizing the comparable sales or stock and debt approaches.

1. The Commission’s Argument that the Weight Tegarden Applied to His Cost Approach and Income Approach Estimates Varies from the Weights Employed by the District Court is Without Merit.

The Commission next contends that Tegarden’s appraisal is not reliable because the weights he afforded the cost and income approaches differ from the weights that the district court afforded those approaches in its Judgment. The district court recognized that Tegarden assigned the income approach an 81% weight and the cost approach a 19% weight. At trial, Tegarden testified that he assigned his income approach estimate an 80% weight and his cost approach estimate a 20% weight; he likely misspoke. With regard to the cost approach and income approach to valuation, Tegarden estimated that the market value of PacifiCorp’s operating property was $8,811,000,000 and $8,242,000,000, respectively. After weighing these approaches and rounding his estimate, he arrived at a market value of $8,350,000,000. The only way Tegarden could have arrived at this rounded valuation was by utilizing a 19% weight for the cost approach and an 81% weight for the income approach (19% x $8,811,000,000 (cost approach) + 81% x $8,212,000,000 (income approach) = $8,350,110,000 as opposed to 20% x $8,811,000,000 (cost approach) + 80% x $8,212,000,000 = $8,355,800,000 ).[17]
The Commission’s witness, Rudd, testified that the weight afforded each approach is based primarily on appraiser judgment:
[F]or many years, the Tax Commission applied a 50/50 weighting to the cost and *772 income approach for electric utility properties. That 50/50 weighting I believe was upheld by the Board of Equalization decisions in the past. In 2007, I ... changed the weighting slightly to a 45/55 weighting. I felt I could still do that.
The Commission concurred with Rudd and left the weights he applied to the cost and income approaches unchanged. Likewise, Tegarden corroborated Rudd’s testimony:
[Throughout the appraisal process, the appraiser is making decisions, judgments, and evaluating the relevan[ce], importance, and reliability of the data used in each approach ... [R]econciliation[, which is another term for weighing,] is not a mathematical exercise but rather a serious judgmental exercise by the professional appraiser to reach a logical legal conclusion of value. Therefore the appraiser must place the most emphasis and weight of consideration with the strongest and most supportable market evidence.
Based on Tegarden’s and Rudd’s testimony, it is evident that an appraiser largely relies on his or her own judgments when he or she reconciles these approaches. The Commission’s contention that there is some sort of discrepancy between Tegarden’s appraisal and the district court’s Judgment is without merit.
5. The Fact that Tegarden Utilized His Appraiser Judgment when He Made His Appraisal Does Not Render the District Court’s Reliance on Said Judgment Erroneous.
The Commission asserts that Tegarden’s external obsolescence estimate is too dependent on the expected rate of return and the required rate of return, which the Commission suggests Tegarden could easily manipulate, and that Tegarden’s required rate of return of 9.10% differed significantly in terms of monetary value when it is compared with either Rudd’s 8.89% required rate of return estimate or Eyre’s 8.72% required rate of return estimate.
At trial, the Commission’s expert Eyre testified: “[Appraisal practice is not an exact science,] it’s fraught with numerous judgments [and] assumptions. And obviously, the reliability of an appraisal is based upon the validity and the ability of the appraiser to defend those judgments and assumptions.” This sentiment was repeated throughout the trial. In fact, Rudd testified that he would have accounted for external obsolescence, if he was satisfied that there was sufficient market evidence. In this vein, he stated as follows:
If the market supported such a suggestion by the company that there was economic or external obsolescence and the market supported it, I mean, yeah, I would be happy as an appraiser to provide economic obsolescence adjustment if I felt as an appraiser that it was warranted and that there was market evidence that told me that it needed to be made. I have no problem with that.
Likewise, although Eyre testified that he believed that the FERC Form’s depreciation accounts for all forms of obsolescence, he testified that the cost indicator has a large amount of subjectivity, which sometimes creates controversy. In describing the HCLD Method, he stated that “it’s objective insofar as ... if you use HCLD, you’ve got a very objective source to drive the numbers. It’s subjective in the fact as to your analysis of those numbers and the relative nature of them as they relate to your observations of the market as a whole.” Like Rudd, Eyre testified that he could find no market evidence indicating external obsolescence outside what was reported in the FERC Form. Based on these assertions, it was not erroneous for the district court to find that the decision to provide a deduction for external obsolescence is a product of appraiser judgment.
At no point was it suggested by the Commission that Tegarden is a “trailblazer” when it comes to appraising the operating assets of an electric company. He utilized many of the same methods and theories that Rudd *773 and Eyre employed. Throughout, Rudd and Eyre testified that they believed that Tegarden’s use of his appraiser judgment was misplaced or farfetched. But PacifiCorp countered these assertions by providing experts who testified as to the misuse of Rudd’s and Eyre’s appraiser judgments in their appraisals. The district court was faced with three equally compelling, yet generally subjective, appraisals. It rendered its decision based primarily on the soundness of Tegarden’s theories and his ability to defend those theories and judgments during cross-examination.
Furthermore, the Commission’s argument that Tegarden utilizes “obsolescence in the air”[18] to arrive at his estimate of external obsolescence is also unconvincing for the same reasons. The Commission is essentially reasserting that Tegarden’s approach is too subjective. The fact that Tegarden, Rudd, and Eyre arrived at different required rate of return estimates is irrelevant and only highlights the subjective nature of these estimates in general.

6. The Commission’s Suggestions to Make Tegarden’s Appraisal More Reliable Are Not at Issue.

The Commission suggests that Tegarden’s appraisal can be made more reliable, if this Court would require PacifiCorp to provide evidence to show the causes of obsolescence, the quantity of obsolescence, and that obsolescence really affects the properties in question. The Commission claims that PacifiCorp only provided the district court with three causes of external obsolescence: regulatory law; the fact that the Commission does not allow for the inclusion of assets financed with deferred income taxes in the rate base; and economic lag. Again, this Court is not going to reweigh the evidence as to how Tegarden’s approach could be made more reliable. This is a question of fact for the trial court to weigh and consider. After doing so, the district court determined that Tegarden, his methodologies, and his use of his appraiser judgment were more credible and reliable than the Commission’s experts and their methodologies. The Commission has not provided any convincing argument or authority suggesting the district court’s reliance on the aforementioned facts — which were not challenged as incompetent and therefore presumed to be competent for purposes of this appeal — amounted to a clearly erroneous judgment.
VI. Conclusion
Because the district court’s Judgment was not clearly erroneous and was supported by substantial and competent evidence, the Judgment of the district court is affirmed. Attorney’s fees were not requested. Costs are awarded to PacifiCorp.

. It should be noted the IPUC, not the Idaho State Tax Commission, sets the rate base and enters orders regarding the rate base. Further, the IPUC only determines rates within Idaho.

. Idaho Code section 63-201 was amended in 2008. With regard to electric utilities, it states, in relevant part, that "operating property” consists of “real and personal property operated in connection with ... [the] utility ... wholly or partly within this state, and which property is necessary to the maintenance and operation of the ... utility____” I.C. § 63-201(16).

. That section was amended in 2008. It is now found in subsection (15) in I.C. § 63-201.

. The district court incorrectly stated that the Commission’s final Idaho taxable value of PacifiCorp’s operating property was $252,382,129. (Attach. F, at 61.) The actual Idaho taxable value determined by the Commission was $252,382,819.

. Norman Ross, Tax Director with PacifiCorp, is accredited in business valuation and a certified public accountant. He testified that PacifiCorp’s goal is to achieve a market rate of return on its investments, which he contended had been difficult, if not impossible, to achieve due to allocation issues, the economy, and rate regulation. He further testified that Rudd's and Eyre's cost approach is deficient because it relies too heavily on book depreciation.

. Steven MeDougal, Director of Revenue Requirements with PacifiCorp, testified that PacifiCorp has not been earning its allowed rate of return for a number of years due to many external factors. He opined that as of December of 2007, PacifiCorp was experiencing a return on rate base of 7.467%, while the allowed rate of return was near 10.2% to 10.6%. With regard to the depreciation reported in the FERC Form, he stated that the obsolescence referred to in that filing is really functional obsolescence, meaning it has to do with the functional characteristics of the asset. He also testified that Eyre’s and Rudd's appraisals rely too heavily on book value with regard to their cost approach to valuation. MeDougal is not a certified appraiser and never expressed any opinion of value.

.Tegarden testified that his unit appraisal complied with the Uniform Standards of Professional Appraisal Practice.

. In explaining his method of calculating external obsolescence, Tegarden stated:
A prospective purchaser of the operating electric property of PacifiCorp would require a market rate of return. If the net operating income for each of the last five years is divided by the average net plant which earned that income, the rate of return on assets can be calculated. The latest years, the latest five-year average, the latest three-year average, and five-year trend rates of return were 7.12%, 6.30%, 6.61%, and 7.23%, respectively. We selected 7.20% as representative of the rate of return level which can be reasonably expected for the Company. This rate of return is based on net operating income intended by the regulatory commissions to cover the cost of capital. If this 7.20% selected rate of return is compared with the investor required return of 9.10%, the achieved rate of return is 1.90% below the investor required return (9.10% - 7.20% = 1.90%). This 1.90% deficiency in rate of return equates to a 20.88% obsolescence factor (1.90% / 9.10% = 20.88%).

. In his appraisal, Tegarden stated that his estimate of external obsolescence recognizes that PacifiCorp has earned, on average, less than the market required rate of return on its total net investment in plant and equipment. He further elaborated that part of his external obsolescence estimate is attributable to the exclusion of properties purchased with deferred income taxes from the rate base and the effects of competition.

. Tegarden based his capitalization rate estimate on the band of investment technique.

. Rudd estimated cash flow to be around $690,000,000 and the capitalization rate to be 8.89%, resulting in a valuation estimate of $7,761,529,809. Tegarden's cash flow estimate was larger than Rudd’s because he attempted to account for future earnings anticipated as a result of the construction in progress and because his estimate included floatation adjustments, which are the expenses involved in issuing debt and equity.

. With regard to the weight afforded each approach in his appraisal, Tegarden mistakenly testified that he applied a 80% weight to his income approach and a 20% weight to his cost approach.

. With regard to weighing the indicators of value, Tegarden stated that “throughout the appraisal process, the appraiser is making decisions, judgments, and evaluating the relevance, importance, and reliability of the data used in each approach.’’ ”[R]econciliation[, which is the process by which an appraiser subjectively *766 weighs the various approaches to valuation,] is not a mathematical exercise but rather a serious judgmental exercise by the professional appraiser to reach a logical conclusion of value.” In this regard, the appraiser must place the most emphasis and weight on the approach with the strongest and most supportable market evidence.

. Dr. Ben Johnson, who is the president of Ben Johnson, Associates, Inc., is a consulting economist. He is not a certified appraiser and holds no accounting degrees. Johnson contended that ”[a]s an economist and an observer of market values through [his] work, [he has] ... some understanding of market values.” as to whether it, in fact, precisely picks up every possible form of obsolescence, I don’t think you can assert that.” Johnson also admitted that depreciation studies generally occur every 4 or 5 years. He further testified that Tegarden should have accounted for PacifiCorp’s deferred income taxes in his net operating income estimate.

. Specifically, the district court held that "in many respects[, this action] was a battle of the experts.” It recognized that ”[e]ach of the witnesses has considerable experience in his particular field. Nevertheless, having had the special opportunity of listening to each witness as he gave live testimony and was subjected to rigorous cross examination, the court was especially impressed by Mr. Tegarden and found his testimony and opinions to be more credible, more reliable, more persuasive, and entitled to greater weight than the testimony and opinions of the witnesses for the Tax Commission.” The district court stated that it "reviewed the criticisms of Mr. Tegarden's valuations but [found] them to be unpersuasive.” After evaluating all the evidence, the district court held that the Commission's valuation was erroneous and that based on a preponderance of the evidence, "Tegarden’s estimate of the value of PacifiCorp's operating property as of January 1, 2008, is the most accurate estimate of value in the record.”

. The Commission stated, on several occasions, that it was confining this appeal to a discussion of Tegarden’s cost approach. In fact, the Commission only provided this Court with one issue on appeal, "May PacifiCorp deduct obsolescence from the cost approach to value without offering evidence of the cause of the obsolescence, the quantity of the obsolescence, and that the asserted obsolescence actually affects the property?” Therefore, this opinion will only address cost of capital in relation to Tegarden’s external obsolescence estimate.

. With regard to his rationale for utilizing or not utilizing the various approaches to valuation and affording them the weights that he did, Te-garden stated:
The cost approach was analyzed in detail and given careful consideration. The cost of reproduction and cost of replacement were considered. Because the earnings base is limited to original cost less depreciation these costs should be given very little credence. The original cost less depreciation is considered the best starting point in the cost approach. However, due to the inability of the Company to consistently earn a market rate of return, it was necessary to estimate the amount of obsolescence present in the property. With the deduction of all forms of depreciation, the cost approach is an important indicator in determining the value of an electric company, and was given due consideration in the final estimate of value.
The income approach was also given careful consideration. The potential income stream of the company has been analyzed. It was necessary to consider Company projections, rate case decisions, and other historical data in predicting future income. These estimates were correlated with our own estimates, based on our analysis of the expected earnings. The money market has been analyzed and much study given to the estimation of a reasonable rate of capitalization. A prospective purchaser of electric property would very carefully consider the earning capability of the property. The income approach is a strong indication of value, and it was given considerable weight in the final estimate of value.
The sales comparison approach could not be used in the ordinary manner as there are no arm’s length market value sales of truly comparable properties. The stock and debt approach was considered as a substitute for the sales comparison approach. The common stock is owned entirely by MidAmerican Energy and is not traded in the securities markets. For this appraisal report, sale of PacifiCorp’s common stock to MEHC was analyzed even though it is clear that the purchase was an investment value decision rather than a market value decision. Also, the stock and debt ap *772 proach was considered but not believed to be a sound indicator in the final estimate of market value for this report. Therefore, we have not included the stock and debt approach as an indicator of market value for this appraisal report.

. It is unclear whether "obsolescence in the air” is a term that the Commission made up for the purpose of this appeal. That term is generally used with regard to military defense systems.