# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket 40992

NORTHWEST FARM CREDIT SERVICES, )
FLCA, a federally chartered instrumentality )
of the United States of America, )
    )
    Plaintiff-Respondent, )
    )
v. )
    )
LAKE CASCADE AIRPARK, LLC, an Idaho )
limited liability corporation; DONALD E. )
MILLER and CANDACE W. MILLER, )
husband and wife, )
    )
    Defendants-Appellants, )
and )
    )
DAVID A. BUICH and KAREN L. BUICH, )
husband and wife, )
    )
    Defendants. )
_____ )

Boise, April 2014 Term

2014 Opinion No. 67

Filed: July 31, 2014

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Valley County. Hon. Thomas F. Neville, District Judge, and Hon. George D. Carey, Senior District Judge.

The judgment of the district court is affirmed.

Stoel Rives LLP, Boise, for appellants. W. Christopher Pooser argued.

Cooper & Larsen, Chartered, Pocatello, for respondent. Ron Kerl argued.

_____

J. JONES, Justice

Northwest Farm Credit Services recovered a deficiency judgment against the Appellants following the foreclosure of two mortgages on property located in Valley County. Lake Cascade Airpark, LLC, Donald Miller, and Candace Miller appealed the judgment, contending that the reasonable value of their foreclosed property was substantially more than the value determined by the district court.

## I.
## BACKGROUND

Although currently inactive, the Lake Cascade Airstrip, which lies next to Lake Cascade in

1

Valley County, was at one point "one of the premier recreational strips in Idaho." In 2004, hoping to create a residential community—an "airpark"—around this airstrip, Donald and Candace Miller and David and Karen Buich formed Lake Cascade Airpark, LLC, with the intention of acquiring development property. Subsequent to its formation, the LLC purchased 333.63 acres adjacent to the airstrip ("the Property"), which is the subject of this appeal.

In 2008, the LLC, the Millers, and the Buichs borrowed $2,450,000.00 from Northwest Farm Credit Services, FLCA, and executed a Note and Loan Agreement. The loan was secured by a mortgage on the Property. At the same time, the LLC, the Millers, and the Buichs borrowed another $500,000 from Farm Credit through an equity line of credit and executed an Equity Line of Credit Note and Loan Agreement. This line of credit was also secured by a mortgage on the Property.

Eventually, the LLC, the Millers, and the Buichs failed to make their required payments, and in 2012 Farm Credit filed a complaint to foreclose the mortgages securing those loans and to obtain a deficiency judgment. Farm Credit filed a motion for summary judgment, which the district court granted in part, holding that the defendants defaulted on the loans and granting Farm Credit foreclosure of the mortgages. Because the district court determined that genuine issues of material fact existed with respect to the amount due and owing on the loans and the reasonable value of the mortgaged property, it denied summary judgment on those issues. After a bench trial,[1] the district court entered its Partial Findings and Conclusions and Partial Judgment, holding that the Property had a reasonable value of $4,500.00 per acre, or $1,501,500.00 for the entire parcel, rounded up from $1,501,355.00 and that $3,532,277.04 was owing on the mortgage notes as of September 24, 2012. The LLC and the Millers moved to amend the district court's Partial Findings and Conclusions and, in the alternative, for a new trial. The district court denied these motions.

Farm Credit purchased the Property at a sheriff's sale and then moved for entry of a judgment for the deficiency. The district court entered a deficiency judgment in the amount of $2,105,986.16 on March 19, 2013. The LLC and the Millers filed a timely appeal.

## II.
## ISSUES ON APPEAL

I.      Did the district court err when it found that the mortgaged property's reasonable value was $4,500 per acre?

II.     Did the district court err when it denied Appellants' post-trial motions?

---

[1] The Buichs did not participate in trial because they stipulated to the entry of a default judgment against them.

III.     Is either party entitled to an award of attorney fees?

**III.**
**STANDARD OF REVIEW**

"We review a bench trial to determine whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law." *American Pension Services, Inc. v. Cornerstone Home Builders, LLC*, 147 Idaho 638, 640, 213 P.3d 1038, 1040 (2009) (quotation marks omitted).

**IV.**
**ANALYSIS**

On appeal, the Appellants assign error to the district court's finding that the property had a reasonable value of $4,500 per acre and to its refusal to amend its findings and grant a new trial on the reasonable value of the property. Both the Appellants and Farm Credit request attorney fees on appeal.

**A. Reasonable Value**

In foreclosure actions, a mortgagee may obtain a deficiency judgment if a foreclosure sale does not satisfy a mortgagor's debt.[2] I.C. § 6-108. "[T]he deficiency is limited to the difference between the fair market value of the real property and the amount of the unpaid debt." *Quintana v. Anthony*, 109 Idaho 977, 979, 712 P.2d 678, 680 (Ct. App. 1985). Thus, the district court must determine "the fair market value of the mortgage[d] property before a deficiency judgment can be awarded." *Placerton,* 100 Idaho at 870, 606 P.2d at 974.

At the bench trial, the parties presented appraisals and testimonial evidence to establish the Property's fair market value. Farm Credit offered the testimony of Susan Robbins—Farm Credit's employee and a senior appraiser—and the appraisal Robbins performed in May 2012. To prepare her appraisal, Robbins inspected the Property and found that it is irrigated with level

---

[2] I.C. § 6-108 provides the following:

> No court in the state of Idaho shall have jurisdiction to enter a deficiency judgment in any case involving a foreclosure of a mortgage on real property in any amount greater than the difference between the mortgage indebtedness, as determined by the decree, plus costs of foreclosure and sale, and the reasonable value of the mortgaged property, to be determined by the court in the decree upon the taking of evidence of such value.

It seems that the terms "reasonable value" and "fair market value" are used interchangeably. *Eastern Idaho Production Credit Assoc. v. Placerton, Inc.,* 100 Idaho 863, 869, 606 P.2d 967, 973 (1980) ("The statute substitutes the fair market value of the property for the price at foreclosure sale as the amount to be deducted from the debt in order to fix the amount of the deficiency judgment.").

topography and, at the time of trial, was "being used as irrigated pastureland." She explained that she had performed an analysis to determine the "highest and best use" of the Property. To perform a highest and best use analysis, an appraiser looks at "four uses that contribute to a subject property." Robbins explained that the "four uses" of a property are its legal use, physical use, feasible use, and maximum productive use.

> So, the legal uses can be any type of uses that the County allows. The physical uses would be topography, location, access, water rights, soils, what physically is on that property.

> The feasibility use looks at what's feasible on this property; is it cost productive or feasible to develop, or to do any other type of uses, or is it not cost effective on the subject property.

> Then you look at the maximum productive use of the property. What are other surrounding properties doing; is there any buyers for those type of uses? And then, you conclude what the highest and best use is.

As to legal use, Robbins explained that although the Property "is zoned multiple use[,]" the County "did not feel" it "was suitable for development. . . ." because of its "high water table. It's – it's considered not able to allow for individual septic systems." And, "[a]ccording to the County," the Property could not be developed into multiple housing units and would instead "be kept in agricultural use." As to the physical use, Robbins found the Property's soils "conducive to irrigated pastureland or agriculture." In her view, the Property "conform[ed] to the . . . surrounding areas; all the properties around . . . the subject are also irrigated pastureland."

As to the Property's feasible use, Robbins stated that "the owners had platted" the Property, but it "hadn't been approved by the County." She explained that by May of 2012, the real estate market was "depressed" and showed "little activity." As a result, there were "no active developer buyers" in the market, so at the "date of the appraisal report," the Property "would not be suitable for development" or for sale "as development property."

Robbins also noted that the Property's owners had previously attempted to develop a wetland mitigation bank on the Property.[3] She explained that she understood wetland mitigation

---

[3] Wetland mitigation banks are governed by Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and are defined as "the restoration, creation, enhancement, and, in exceptional circumstances, preservation of wetlands or other aquatic habitats expressly for the purpose of providing compensatory mitigation in advance of discharges into wetlands permitted under the Section 404 regulatory program." Regulatory Guidance Letter, *Establishment and Use of Wetland Mitigation Banks in the Clean Water Act Section 404 Regulatory Program*, U.S. Army Corps of Engineers and U.S. Environmental Protection Agency (Aug. 23, 1993).

banking to mean "that when an owner of a property has wetlands, and he destroys the wetlands or changes the use of the wetlands, that under the Clean Water Act he is obligated to replace what acreage of that wetlands was – that he destroyed." Robbins stated that the owner can then "either go and buy similar property, that has the same acreage that he destroyed of wetlands, or he can go into the Wetland Bank and buy credits." As to the Property, she explained that "[t]here was a proposal for a wet land bank on this property in 2008. . . . The owner, in 2008, was planning on using the wet land areas for his open space in his development. This development did not happen." Robbins explained that in making her appraisal, she "considered the wetland mitigation. The cost to do that is very high, the time – it's very time consuming, and I determined that that would not be a feasib[le] use on the subject property." As to the maximum productive use, Robbins "determined that because the buyers out there are neighboring ranchers or neighbors in that area, wanting to keep it in . . . agricultural use," agriculture would be the Property's maximally productive use. After engaging in this analysis, Robbins found that "[t]he highest and best use of the [P]roperty is as agriculture."

To appraise the Property's value, she also researched other property for sale, "investigated" other sales in the area, and discussed the market with other appraisers. She identified comparable sales varying from $2,717 per acre to $7,568 per acre. Ultimately, Robbins valued the property at $1,335,000.00, or $4,001.00 per acre.

For their part, the Appellants offered into evidence a previous appraisal of the Property by Robbins, the testimony of Donald Miller, and the testimony of James Fronk. Susan Robbins had previously appraised the Property for Farm Credit in 2008 when the loans were initiated. At that time, she valued the Property at $5,140,000.00, or $15,406.00 per acre. She explained that the difference in her 2008 and 2012 appraisal values was due to the difference in the 2008 and 2012 markets. "The influence of residential subdivisions for recreational properties increased in 2004–2008. The resort town of McCall and the creation of the new ski resort, Tamarack, elevated values

---

Whenever government regulators allow a developer to impact a wetland, the developer must compensate for the impact after demonstrating that the impact cannot be avoided or further minimized. Compensation can occur either at the site of the impact—"on-site" mitigation—or at a different site—"off-site" mitigation. Developers are responsible for their own on-site compensation but use wetlands mitigation banking for their off-site compensation needs. A mitigation bank functions by selling developers "compensation credits" that the bank has generated by restoring, enhancing, creating, or preserving an off-site wetland area.

Shirley Jeanne Whitsitt, *Wetlands Mitigation Banking*, 3 Envtl. Law. 441, 443 (1997) (footnotes omitted).

above that of the historic agricultural based land values as well as residential lots during that time period." Yet, "[i]n late 2008 and early 2009, Tamarack declared bankruptcy and closed for the 2009 season." Tamarack's closure "depressed the market very much."

Miller testified in his role as a principal in the LLC and as a person with experience in real estate. He stated that "[t]he highest and best use" of the Property was as a wetland mitigation bank and as "a limited development for an air park concept." He noted that "within the last 30 days," before trial, ten mitigation bank credits were sold "to the City of Boise for $4.50 per square foot, which is equivalent to approximately [$]180,000 per credit." In Miller's opinion, the Property's value was, at minimum, 4.5 million dollars. He based his opinion on "the potential for the sale of wetland credits, either on a wholesale basis or a sale of the bank, once approved, and sale of interests in the air park concept . . . ." Miller did not testify as to the value of this "potential."

Fronk is an Army Corps of Engineers certified wetland delineator and the owner of Secesh Engineering. While testifying, he explained wetland mitigation banks:

> Wetland banking is basically an instrument that's created where it is approved, and . . . in our area by a group of agency people, lead [sic] by the Army Corp of Engineers, that go through the process to see if it meets the criteria set forth in the Clean Water Act and the 404 section of that.
>
> Once that's established and they are accredited wetlands, some kind of format, either acre-for-acre or a ratio there of [sic], 'cause there's different hierarchies of wetlands. There's emergent, shrub-scrub, and – and furthermore other ones higher than that. There's . . . degraded wetlands that you can then . . . uplift to another level, so there's different formulas that you can do.
>
> But . . . the Clean Water Act says that you have to replace all wetlands or waters of the United States in like, in kind. You have to – if you're going to impact them here, you have to replace them in some place that's viable, and it's the same kind of type and character of wetlands.
>
> So, the . . . banking instrument allows for you to do that. Where if I had, say, five acres of emergent wetlands that were impacted by a regional project, you could go to this bank that's been accredited, purchase five acres of emergent wetlands from them, and meet that replacement goal . . . .

He further explained that "[y]ou can't use existing wetlands to replace wetlands. You have to replace them with new wetlands that meet the same criteria."

From 2007 to 2009, Fronk investigated the property to determine whether it met the criteria for a wetland mitigation bank. He testified that the Property was "a prime spot for a wetland bank" but that the project was "on hold," and it would take "approximately a year" for the project to

6

reach completion. Fronk stated that the Idaho Transportation Department had "recently . . . purchased approximately three or four acres of emergent wetlands from a bank, and . . . they paid approximately [$]25,000 per tenth of acre." He explained that the sale of credits in Idaho is "fairly new" and believed that at the time of trial, there were four mitigation banks in Idaho. Fronk did not opine as to the value of the Property's potential credits or the value this potential added to the Property.

The district court evaluated this evidence in its Findings of Fact and Conclusions of Law. The district court first noted that the Property, or at least part of it, had "future potential as a source of wetland mitigation." He also noted that Miller "criticized the plaintiff's appraiser for not taking into account the future potential for recreational airpark development and wetland credits, as well as for failing to look for comparables outside Valley County."

Nonetheless, the district court, "[a]fter considering all the evidence," ultimately concluded "that the valuation given by [Farm Credit's] appraiser is more credible than the one given by Mr. Miller." The district court observed that "Mr. Miller's opinion has a large component of wishful thinking about what might have been if the market had not taken a disastrous turn for the worse." It found that Robbins' "appraisal appears to be much more in touch with the reality of the marketplace, although a bit on the low side." Ultimately, the district court determined that the Property "in its current condition and in the current market" had "a reasonable or fair market value of $4,500.00 per acre or $1,501,335.00, rounded to $1,501,500.00, as of September 25, 2012."

The Appellants argue that the record does not support the district court's finding that the Property was "valuable only as agricultural land . . . ." On appeal, "[w]hen findings of fact are challenged, the appellant has the burden of showing error, and the reviewing court will review the evidence in a light most favorable to the respondent." *Higginson v. Westergard*, 100 Idaho 687, 689, 604 P.2d 51, 53 (1979). The Court will not disturb the district court's finding of fact unless the finding is clearly erroneous. *Pacificorp v. Idaho State Tax Commission*, 153 Idaho 759, 767, 291 P.3d 442, 450 (2012). A finding is clearly erroneous if is not supported by substantial and competent evidence. *Id.* "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Jarvis v. Rexburg Nursing Center*, 136 Idaho 579, 583, 38 P.3d 617, 621 (2001). Here, the Appellants do not challenge the competency of the evidence. Thus, the only issue is whether the evidence supporting the trial court's decision is substantial. "Evidence is substantial if a reasonable trier of fact would accept it and rely upon it in

determining whether a disputed point of fact has been proven." *Pacificorp*, 153 Idaho at 768, 291 P.3d at 451 (quotation marks omitted). "Substantial evidence is less than a preponderance of evidence, but more than a mere scintilla." *Chisholm v. Idaho Dept. of Water Resources*, 142 Idaho 159, 164, 125 P.3d 515, 520 (2005). It "need not be uncontradicted, nor does it need to necessarily lead to a certain conclusion; it need only be of such sufficient quantity and probative value that reasonable minds could reach the same conclusion as the fact finder." *Id.*

The Appellants argue that the evidence supporting the district court's decision was not substantial because Robbins did not have the necessary knowledge or experience to correctly appraise the value of a property with wetland mitigation bank potential and that the potential for the Property itself to become a mitigation bank was much more favorable than Robbins believed. Specifically, the Appellants argue that the Property "is uniquely situated for the establishment of new wetlands and a wetland mitigation bank. . . ." and that Fronk's testimony proved "Robbins' assumptions about the expense and time involved to complete development of a mitigation wetland bank on the property . . . wrong." They contend that "Fronk also explained, again contrary to Robbins' assumptions, . . . that a market for the wetland credits already exists in Idaho and is not limited to just Valley County but would be positioned for sale within a service area that includes the Payette River, Weiser River, and Boise River drainages."

Appellants' argument as to Robbins' knowledge and experience may go to Robbins' qualifications as an expert. An expert possesses "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." I.R.E. 702. The Appellants do not, however, specifically contend that Robbins was not qualified under I.R.E. 702. Thus, it seems Appellants contend that Robbins' alleged lack of knowledge and experience damaged the credibility of her testimony. "The determination of the credibility of witnesses and the weight to be given their testimony are exclusively within the province of the trier of facts." *Higginson*, 100 Idaho at 692, 604 P.2d at 56. Thus, "[i]n determining whether there was substantial evidence to support the district court, this Court must give due regard to the special opportunity of the trial court, acting as the fact finder, to judge the credibility of those witnesses." *Id.* Given the regard this Court must provide to the district court's judgment as to Robbins' credibility, we will not evaluate the credibility of Robbins' testimony and appraisals.

8

Furthermore, Appellants' argument that Fronk's testimony disproved the evidence offered by Farm Credit seems to ask this Court to reweigh the conflicting evidence presented to the district court. The Court, however, will not disturb conflicting evidence that is substantial and competent. *Aspiazu v. Mortimer*, 139 Idaho 548, 550, 82 P.3d 830, 832 (2003) ("Findings based on substantial, competent evidence, although conflicting, will not be disturbed on appeal.).

Here, Robbins' testimony and 2012 appraisal constitute substantial evidence because they allow reasonable minds to reach the same conclusion as the district court and provide more than a mere scintilla of evidence to support the district court's determination. Robbins testified that the Property was valuable as agricultural land and provided values from comparable property sales. She addressed the notion that the property had value for its mitigation bank potential, yet determined that wetland banking was not a feasible use. The Appellants themselves admit that wetland mitigation banking is new in Idaho and failed to present any concrete evidence as to the value added by the potential for developing a wetland mitigation bank. In conclusion, because the district court's determination of the Property's reasonable value is supported by substantial evidence and therefore not clearly erroneous, we will not disturb it.

### B. Post-Trial Motions

The Appellants argue that the district court abused its discretion when it refused to amend its findings or, in the alternative, grant a new trial on the reasonable value of the property. The Court reviews a district court's decision to grant or deny a motion to amend findings or to grant a new trial for abuse of discretion. *Belstler v. Sheler*, 151 Idaho 819, 823, 264 P.3d 926, 930 (2011); *Lanham v. Idaho Power Co.*, 130 Idaho 486, 497–98, 943 P.2d 912, 923–24 (1997).

> The test for whether a trial court has abused its discretion is three-fold: (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason.

*Burgess v. Salmon River Canal Co., Ltd.*, 127 Idaho 565, 573, 903 P.2d 730, 738 (1995).

The Appellants admit that "the district court recognized the discretion it is afforded in deciding motions to amend and for a new trial." They contend, however, that the district court acted outside the bounds of its discretion and did not reach its decision through an exercise of reason when denying these motions because "the district court's finding that the property should be valued only as agricultural land, because a wetland mitigation bank was not feasible, was not

9

supported by substantial evidence." This argument fails because, as discussed above, the district court's decision was supported by substantial evidence.

### C. Attorney Fees

Farm Credit argues that it is entitled to its attorney fees under the attorney fee provisions of the Notes, the Loan Agreements and the Mortgages. Both Notes and Loan Agreements provide that "Borrower shall pay Lender on demand all attorney fees and costs incurred to protect or enforce any of Lender's rights in bankruptcy, appellate proceedings, or otherwise under this Note or the Loan Documents." Both mortgages provide that "any advances, including, without limitation, attorney fees or costs, paid or incurred by Mortgagee to protect or enforce its rights under the Loan Documents, in bankruptcy, appellate proceedings or otherwise, shall be payable on demand and shall become a part of the indebtedness secured by this mortgage."

The "Appellants concede" that if Farm Credit prevails, "the two loan agreements entitle" Farm Credit "to recover its reasonable attorney fees on appeal." Because Farm Credit prevails in this appeal, it is entitled to its fees.

## V.
## CONCLUSION

The judgment of the district court is affirmed. Farm Credit is awarded its attorney fees and costs on appeal.

Chief Justice BURDICK, and Justices EISMANN and HORTON CONCUR.